1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

SANDRO S. PEREZ,

      Plaintiff,

    v.

A. SMITH, et al.,

      Defendants.

Case No. 1:20-cv-00840-ADA-SAB (PC)

FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE DENIED, AND DEFENDANT DOE BE DISMISSED FROM THE ACTION

(ECF No. 68)

      Plaintiff Sandro S. Perez is proceeding pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983.

      Currently before the Court is Defendants' motion for summary judgment, filed April 22, 2022.

## I.

## RELEVANT BACKGROUND

      This action is proceeding against Defendants A. Smith, D. Schuller, G. Nwachukwu, J. Burell, V. Giannandrea, J. Trujillo-Villa, J. Szalai, J. Alvarez, and an unidentified designated custody supervisor at Avenal State Prison (ASP) for deliberate indifference to plaintiff's safety in violation of the Eighth Amendment of the U.S. Constitution.[1]  (ECF No. 15.)

---

[1] This unnamed Defendant was never identified by Plaintiff, despite advisement to do so, and this individual is therefore subject to dismissal pursuant to Rule 4 of the Federal Rules of Civil Procedure.

1      Defendants filed an answer to the complaint on December 21, 2020.  (ECF No. 23.)

2      On December 22, 2020, the Court issued the discovery and scheduling order.  (ECF No.

3  25.)

4      Defendants filed a first amended answer on January 7, 2021.  (ECF No. 28.)

5      After an unsuccessful settlement conference, the Court issued an amended discovery and

6  scheduling order on March 17, 2021.  (ECF No. 37.)

7      On April 22, 2022, Defendants filed the instant motion for summary judgment.  (ECF No.

8  68.)

9      On May 9, 2022, the Court granted Plaintiff an extension of time to file an opposition.

10  (ECF No. 71.)

11      On June 10, 2022, Plaintiff filed a motion to continue consideration of Defendants'

12  motion for summary judgment.  (ECF No. 72.)  On July 15, 2022, Defendants filed an opposition

13  to Plaintiff's motion.  (ECF No. 74.)

14      On August 10, 2022, the Court denied Plaintiff's motion to continue consideration of

15  Defendants' motion for summary judgment, and Plaintiff was granted thirty days to file

16  opposition.  (ECF No. 75.)

17      No opposition has been filed and the time to do so has expired.

18              **II.**

19           **LEGAL STANDARD**

20  **A.    Summary Judgment Standard**

21      Any party may move for summary judgment, and the Court shall grant summary

22  judgment if the movant shows that there is no genuine dispute as to any material fact and the

23  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks

24  omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's

25  position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to

26  particular parts of materials in the record, including but not limited to depositions, documents,

27  declarations, or discovery; or (2) showing that the materials cited do not establish the presence or

28  absence of a genuine dispute or that the opposing party cannot produce admissible evidence to

support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## III.

## DISCUSSION

### A.    Summary of Plaintiff's Complaint

On December 18, 2018, in the course of his employment as a facility C program office clerk, Plaintiff was assisting Defendants Smith, Schuller, Nwachukwu, Burell, Giannadrea and Trujillo-Villa in preparing for an initial "Unit Classification Committee" (UCC" where inmates newly arrived at Avenal State Prison (ASP) facility C are classified.

After preparing a list of inmates scheduled for UCC that morning and circulating it to the housing unit officers, Plaintiff was informed that the Committee (which consists of Defendants Smith, Schuller, Nwachukwu, Burell, Giannadrea and Trujillo-Villa) wanted to see inmate Dante Quezada first.  In Plaintiff's experience as a program office clerk for more than a year, he

1  frequently observed that the Committee would ask to see an inmate first if they were anticipating

2  some kind of issue with him, behavioral or otherwise.

3      Inmate Quezada arrived for his initial UCC at around 9:00 a.m. and was shown to the

4  room where Defendants Smith, Schuller, Nwachukwu, Burell, Giannadrea and Trujillo-Villa

5  were waiting for him, but then left almost immediately.  After existing the program office,

6  inmate Quezada stood outside speaking to a friend (later identified as inmate A. Galindo who

7  had arrived at ASP with Quezada).  From the window of the office, Plaintiff observed Quezada

8  acting erratically and glancing back toward the program office frequently.

9      Approximately twenty minutes later after Plaintiff had exited the program office, inmate

10  Quezada returned and knocked on the door (which was kept locked for security).  Plaintiff, in

11  accordance with his job duties, opened the door and asked Quezada what he needed.  Quezada

12  asked if his counselor was available, and as Plaintiff turned back toward the Committee

13  conference room to check, he felt a sharp and sudden pain in the side of his neck.

14      Plaintiff jumped back in the program office, and after a brief verbal exchange with

15  Quezada, realized he was bleeding profusely from the left side of his neck.  Plaintiff waved to

16  the counselors through the conference room window and yelled, "He cut me!" at which time they

17  all came out to investigate.  At that point, Quezada fled on foot, but he was apprehended

18  moments later by Defendant Trujillo-Villa.  A homemade weapon consisting of several razor

19  blades attached to a plastic handle (commonly referred to in prison vernacular as a "tomahawk")

20  was found on the ground where Quezada was taken into custody, and a "sheath" for the weapon

21  was found on his person.

22      Medical staff were requested to respond to Plaintiff via radio, and while waiting, some in

23  the office asked who had done this.  Defendant Schuller responded, "A Level 3, Level 4 type,"

24  meaning an inmate generally housed on a high-security yard.

25      ASP medical staff arrived at 9:29 a.m. and confirmed that Plaintiff's throat had been

26  slashed by inmate Quezada.  Plaintiff was transported to the ASP central medical facility where

27  he was informed by the doctor treating him that Quezada had "just missed" his carotid artery (it

28  was so close that one correctional officer [S. Garcia} wished Plaintiff 'happy birthday" because

1 he was so close to losing his life).  The resulting jagged laceration measured 5cm x 0.3mm and

2 penetrated all layers of the skin to the subcutaneous tissue, requiring seven sutures to close.

3       Inmate Quezada was read his Miranda rights, charged with attempted murder, and

4 transported to Pleasant Valley State Prison (PVSP) administrative segregation unit.

5       After returning to facility C, Plaintiff was approached by inmate Galindo who informed

6 him that he and Quezada had both come together from PVSP, a level 3 (high quality) SNY

7 facility, and that both had agreed that if they didn't like ASP they would "do something" to get

8 sent back.  Galindo further explained that while he had decided to stay, Quezada had told him

9 (while speaking to him outside the program office that morning) that he did not want to be on an

10 NDFF yard and was trying to get sent back to PVSP.  Galindo said he tried to talk Quezada out

11 of doing anything violent (though he denied knowing what Quezada planned to do) to no avail.

12 Galindo indicated he had further information to share, but Plaintiff, in severe pain and wanting to

13 lay down, asked to speak to him about it later.

14       Inmate Galindo was subsequently assigned a job on another yard at ASP, and was

15 transferred to that facility before Plaintiff was able to follow up with him.

16       The day after the incident (12/19/2018), Defendant Nwachukwu entered the program

17 office and, joking about the incident, asked Plaintiff "why didn't you even fight back, Perez?  I

18 would have at least tried to defend myself."

19       In the days and weeks that followed, Defendant Smith repeatedly mocked Plaintiff about

20 being attacked, telling Plaintiff (as Plaintiff was leaving the office) to "Be careful, they're cutting

21 clerks out there," or asking, "Do you need someone to go with you for protection."

22       Plaintiff was already enrolled in the institution's mental health program ["CCCMF"]

23 when this occurred, being treated for pre-existing anxiety and depression, including regulation

24 sessions with a staff psychologist.  Plaintiff's anxiety and depression were profoundly

25 exacerbated by not only the incident, but eh subsequent teasing by the Defendants, memories of

26 which continue to trigger enhanced episodes of both conditions and accounts for the primary

27 topic of discussion during his psych sessions.

28

1    In February of 2019, during Plaintiff's annual CCCMF review committee, attended by,

2    inter alia, Plaintiff's psychologist, and his assigned correctional counselor, Defendant Schuller,

3    Plaintiff was discussing the heightened anxiety that continued to torment him following the

4    incident.  Defendant Schuller then commented that Plaintiff "shouldn't feel that way" because

5    Quezada had "intended to attack [him], not [Plaintiff]."  This alerted Plaintiff that Defendant

6    Schuller knew of Quezada's intentions prior to the attack, and Plaintiff began to ask other

7    inmates on the yard if they had seen or heard anything that day.

8    "In March of 2019, Defendant Smith asked Plaintiff if he wanted to be transferred to '5

9    yard' [ASP Facility E] he 'heard they're cutting clerks on this yard.'  Then he said, 'Oops, too

10   late,' and laughed about it.  Defendant Schuller was present when this occurred and pulled Smith

11   aside to speak to him, presumably about his comment [NOTE: Defendant Smith frequently made

12   these kinds of comments in front of other correctional staff and inmates with the intention of

13   embarrassing and shaming Plaintiff about being attacked]."

14   Several days later, when Plaintiff stopped into the newly-remodeled counselor's office

15   and commented that it looked like an insurance office, Defendant Burell asked if Plaintiff wanted

16   to buy any life insurance because he was prone to assault.  This comment triggered an extended

17   episode of severe depression that lasted for several days.

18   In April of 2019, unable to cope with the Defendants' incessant taunts, Plaintiff was

19   forced to quit his job in the program office for the sake of his mental health Prison jobs

20   (especially those that pay)  on ASP Facility C are scarce, and the job of program office clerk is

21   one of the most coveted, well-paying positions on the yard.  Plaintiff's decision to give it up was

22   a measure born out of desperation to avert a complete nervous breakdown.

23   In May of 2019, Plaintiff was approached by two inmates who informed him that they

24   were near the program office on 12/18/2018 when the attack occurred, and said that while Inmate

25   Quezada was being handcuffed, they heard him tell Defendant Trujillo-Villa and Sergeant

26   Gonzales (not named in this action), "I told you I was going to cut someone if you didn't put me

27   back on Level Three."

28

These inmates also reported that after the incident, inmate Galindo told them that when he and Quezada arrived at ASP, Quezada told the R&R sergeant who interviewed him that he didn't want to stay and would "do something" to get sent back to PVSP if they put him on a yard at ASP, but the sergeant told him to take it up with his counselor.

Galindo then told these witnesses that Quezada had told Defendant Nwachukwu (who had an office in Housing Unit 330 where Quezada was housed) prior to the day of the assault that he didn't want to stay at ASP, and if he had to, he would assault another inmate to get off the yard. Defendant Nwachukwu responded by telling Quezada he could not help him because he was not his assigned counselor.

Galindo further told the inmate witnesses that on the morning of the assault, Quezada approached the two Housing Unit 330 officers named as Defendants and repeated his threat to assault another inmate if he was not removed from the yard, but they told him to bring it up at his UCC that morning.

Finally, Galindo conveyed to these witnesses that when Quezada walked into the committee conference room with the six correctional counselors named as Defendants, he repeated his threat again, and his assigned correctional counselor told him to "do what [he had] to do," at which point Quezada left, only to return twenty minutes later to cut Plaintiff's throat.

## B.    Statement of Undisputed Facts[2,3]

### Defendant L. Szalai

1.    Inmate Quezada arrived at Avenal State Prison in early December of 2018. Upon arrival, he was housed at Facility C. (Declaration of L. Szalazi (Szalai Decl.) ¶ 1; Declaration of J. Alvarez (Alvarez Decl.) ¶ 1.)

2.    As a new arrival, Quezada was awaiting an initial classification committee

---

[2] Hereinafter referred to as "UF."

[3] Although Plaintiff did not file an opposition, a verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Plaintiff's complaint is made under penalty of perjury (see ECF No. 1) and is considered as part of the evidence in opposition to Defendants' motion for summary judgment.

1 review, generally scheduled to take place within two weeks of an inmate's arrival at Avenal State

2 Prison.  (Declaration of A. Smith (Smith Decl.) ¶ 2; Declaration of D. Schuller (Schuller Decl.) ¶

3 2; Declaration of G. Nwachukwu (Nwachukwu Decl.) ¶ 2; Declaration of J. Burell (Burell Decl.)

4 ¶ 2; Declaration of J. Trujillo-Villa (Trujillo Decl.) ¶ 2; Declaration of V. Giannandrea

5 (Giannandrea Decl.) ¶ 2.)

6          3.      Szalai was a correctional officer who was assigned as the floor officer in the

7 building that housed inmate Quezada.  (Szalai Decl. ¶ 2; Alvarez Decl. ¶ 2.)

8          4.      Based on general practices, there may have been interactions between Plaintiff

9 and officers Szalai and Quezada.  First, if Quezada first arrived to the housing unit during

10 Szalai's shift, then Szalai or Alvarez would have provided Quezada a basic orientation.  Second,

11 on the morning of December 18, 2018, one of them would have received a phone call from the

12 classification committee's office informing them that Quezada had his initial classification

13 committee review, and would have communicated to Quezada to go to the review office.  (Szalai

14 Decl. ¶ 4; Alvarez Decl. ¶ 4.)

15          **Defendant J. Alvarez**

16          5.      Inmate Dante Quezada arrived at Avenal State Prison in early December of 2018.

17 Upon arrival, he was housed at Facility C.  (Szalai Decl. ¶ 1; Alvarez Decl. ¶ 1.)

18          6.      As a new arrival, Quezada was awaiting an initial classification committee

19 review, generally scheduled to take place within two weeks of an inmate's arrival at Avenal State

20 Prison.  (Smith Decl. ¶ 2; Schuller Decl. ¶ 2; Nwachukwu Decl. ¶ 2; Burell Decl. ¶ 2; Trujillo

21 Decl. ¶ 2; Giannandrea Decl. ¶ 2.)

22          7.      Alvarez was a correctional officer who was assigned as a floor officer in the

23 building housing inmate Quezada.  (Szalai Decl. ¶ 2; Alvarez Decl. ¶ 2.)

24          8.      Based on general practices, there may have been interactions between Plaintiff

25 and officers Szalai and Quezada.  First, if Quezada first arrived to the housing unit during

26 Szalai's shift, then Szalai or Alvarez would have provided Quezada a basic orientation.  Second,

27 on the morning of December 18, 2018, one of them would have received a phone call from the

28 classification committee's office informing them that Quezada has his initial classification

committee review, and would have communicated to Quezada to go to the review office.  (Szalai Decl. ¶ 4; Alvarez Decl. ¶ 4.)

**Defendant D. Schuller**

9.     Inmate Dante Quezada arrived at Avenal State Prison in early December of 2018. Upon arrival, he was housed at Facility C. (Szalai Decl. ¶ 1; Alvarez Decl. ¶ 1.)

10.    As a new arrival, Quezada was awaiting an initial classification committee review, generally scheduled to take place within two weeks of an inmate's arrival at Avenal State Prison.  (Smith Decl. ¶ 2; Schuller Decl. ¶ 2; Nwachukwu Decl. ¶ 2; Burell Decl. ¶ 2; Trujillo Decl. ¶ 2; Giannandrea Decl. ¶ 2.)

11.    In preparation of the review, a number of correctional counselor assigned to the Facility would be given a caseload of inmates who recently arrived at Avenal State Prison. (Schuller Decl. ¶ 2.)

12.    The assigned correctional counselor would conduct research into the inmate's background and create a summary chronology that would be presented at the initial classification committee review.  (Schuller Decl. ¶ 2.)

13.    The counselor would look at an inmate's case factors, which included custody status, previous housing institutions, time left on the sentence, time spent in prison, and whether the inmate had any discipline.  (Schuller Decl. ¶ 2.)

14.    Further, the counselor may interview the subject inmate as part of the research process.  (Schuller Decl. ¶ 2.)

15.    Inmate Quezada was assigned to D. Schuller's caseload.  (Schuller Decl. ¶ 3.)

16.    At that point, staff responded, and Schuller stayed with Plaintiff until he received medical attention.  (Schuller Decl. ¶ 5.)

**Defendant J. Burrell**

17.    Inmate Dante Quezada arrived at Avenal State Prison in early December of 2018. Upon arrival, he was housed at Facility C.  (Szalai Decl. ¶ 1; Alvarez Decl. ¶ 1.)

18.    As a new arrival, Quezada was awaiting an initial classification committee review, generally scheduled to take place within two weeks of an inmate's arrival at Avenal State

1    Prison.  (Smith Decl. ¶ 2; Schuller Decl. ¶ 2; Nwachukwu Decl. ¶ 2; Burell Decl. ¶ 2; Trujillo

2    Decl. ¶ 2; Giannandrea Decl. ¶ 2.)

3         19.    In preparation of the review, a number of correctional counselor assigned to the

4    Facility would be given a caseload of inmates who recently arrived at Avenal State Prison.

5    (Schuller Decl. ¶ 2.)

6         20.    The assigned correctional counselor would conduct research into the inmate's

7    background and create a summary chronology that would be presented at the initial classification

8    committee review.  (Schuller Decl. ¶ 2.)

9         21.    The counselor would look at an inmate's case factors, which included custody

10   status, previous housing institutions, time left on the sentence, time spent in prison, and whether

11   the inmate had any discipline.  (Schuller Decl. ¶ 2.)

12        22.    Further, the counselor may interview the subject inmate as part of the research

13   process.  (Schuller Decl. ¶ 2.)

14        23.    Inmate Quezada was not assigned to Burell's caseload.  (Schuller Decl. ¶ 3.)

15        24.    Schuller had a medical appointment scheduled on the morning of December 18,

16   2018, the day of Quezada's initial classification committee review.  Fearing he may be late, he

17   recruited J. Burell to present in place of him during the review if Quezada was called and he was

18   not there.  (Schuller Decl. ¶ 4; Burell Decl. ¶ 4.)

19        25.    Schuller was late, and Burell presented during Quezada's review on December

20   18, 2018.  (Burell Decl. ¶ 3.)

21        26.    Burell knew something occurred when the alarm was triggered and he responded

22   to the yard.  (Burell Decl. ¶ 7.)

23   **Defendant J. Trujillo-Villa**

24        27.    Inmate Dante Quezada arrived at Avenal State Prison in early December of 2018.

25   Upon arrival, he was housed at Facility C.  (Szalai Decl. ¶ 1; Alvarez Decl. ¶ 1.)

26        28.    As a new arrival, Quezada was awaiting an initial classification committee

27   review, generally scheduled to take place within two weeks of an inmate's arrival at Avenal State

28   Prison.  (Smith Decl. ¶ 2; Schuller Decl. ¶ 2; Nwachukwu Decl. ¶ 2; Burell Decl. ¶ 2; Trujillo

Decl. ¶ 2; Giannandrea Decl. ¶ 2.)

29.    Quezada was not assigned to Trujillo-Villa's caseload.  (Schuller Decl. ¶ 3.)

30.    Trujillo-Villa was present for Plaintiff's classification hearing.  (Trujillo Decl. ¶ 3.)

**Defendant G. Nwachukwu**

31.    Inmate Dante Quezada arrived at Avenal State Prison in early December of 2018. Upon arrival, he was housed at Facility C.  (Szalai Decl. ¶ 1; Alvarez Decl. ¶ 1.)

32.    As a new arrival, Quezada was awaiting an initial classification committee review, generally scheduled to take place within two weeks of an inmate's arrival at Avenal State Prison.  (Smith Decl. ¶ 2; Schuller Decl. ¶ 2; Nwachukwu Decl. ¶ 2; Burell Decl. ¶ 2; Trujillo Decl. ¶ 2; Giannandrea Decl. ¶ 2.)

33.    Quezada was not assigned to Nwachukwu's caseload.  (Schuller Decl. ¶ 3.)

34.    Nwakchuwu was present for Plaintiff's classification hearing.  (Nwachukwu Decl. ¶ 3.)

**Defendant V. Giannandrea**

35.    Inmate Dante Quezada arrived at Avenal State Prison in early December of 2018. Upon arrival, he was housed at Facility C.  (Szalai Decl. ¶ 1; Alvarez Decl. ¶ 1.)

36.    As a new arrival, Quezada was awaiting an initial classification committee review, generally scheduled to take place within two weeks of an inmate's arrival at Avenal State Prison.  (Smith Decl. ¶ 2; Schuller Decl. ¶ 2; Nwachukwu Decl. ¶ 2; Burell Decl. ¶ 2; Trujillo Decl. ¶ 2; Giannandrea Decl. ¶ 2.)

37.    Quezada was not assigned to Giannandrea's caseload.  (Schuller Decl. ¶ 3.)

38.    Giannandrea was present for Plaintiff's classification hearing.  (Giannandrea Decl. ¶ 3.)

**C.    Analysis of Defendants' Motion**

Defendants argue the undisputed records show that Defendants did not have knowledge and were not subjectively aware of any threat posed by Quezada to Plaintiff.  Defendants also argue they are entitled to qualified immunity.

1    **1.    Merits of Plaintiff's Claim**

2    Prison officials have a duty under the Eighth Amendment to protect prisoners from

3    violence at the hands of other prisoners because being violently assaulted in prison is simply not

4    part of the penalty that criminal offenders pay for their offenses against society.  Farmer v.

5    Brennan, 511 U.S. 825, 833-34 (1994); Clem v. Lomeli, 566 F.3d 1177, 1181 (9th Cir. 2009);

6    Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005); Cortez v. Skol, 776 F.3d 1046, 1050

7    (9th Cir. 2015).  However, prison officials are liable under the Eighth Amendment only if they

8    demonstrate deliberate indifference to conditions posing a substantial risk of serious harm to an

9    inmate; and it is well settled that deliberate indifference occurs when an official acted or failed to

10   act despite his knowledge of a substantial risk of serious harm.  Farmer, 511 U.S. at 834, 841

11   (quotations omitted); Clem, 566 F.3d at 1181; Hearns, 413 F.3d at 1040.

12   In short, direct evidence of actual knowledge is not required. Farmer, 511 U.S. at 842.

13   The question is whether prison officials, acting with deliberate indifference, exposed a prisoner

14   to a sufficiently substantial "risk of serious damage to his future health ... and it does not matter

15   whether the risk comes from a single source or multiple sources, any more than it matters

16   whether a prisoner faces an excessive risk of attack for reasons personal to him or because

17   all prisoners in his situation face such a risk." Farmer, 511 U.S. at 843.

18   In this instance, Defendants do not appear to dispute that the alleged deprivation is

19   objectively, sufficiently serious, especially that Plaintiff was stabbed by inmate Quezada.

20   Instead, Defendants argue that the undisputed facts demonstrate that Defendants were not

21   subjectively, deliberately indifferent to the need to protect Plaintiff from an attack by inmate

22   Quezada.

23   Inmate Dante Quezada arrived at Avenal State Prison in early December of 2018. Upon

24   arrival, he was housed at Facility C.  (UF 1, 5, 9, 17, 27, 31, 35.)  As a new arrival, Quezada was

25   awaiting an initial classification committee review, generally scheduled to take place within two

26   weeks of an inmate's arrival at Avenal State Prison.  (UF 2, 6, 10, 18, 28, 31, 35.)  In preparation

27   of the review, a number of correctional counselor assigned to the Facility would be given a

28   caseload of inmates who recently arrived at Avenal State Prison.  (UF 11.)  The assigned

12

1   correctional counselor would conduct research into the inmate's background and create a

2   summary chronology that would be presented at the initial classification committee review. (UF

3   12.) The counselor would look at an inmate's case factors, which included custody status,

4   previous housing institutions, time left on the sentence, time spent in prison, and whether the

5   inmate had any discipline. (UF 13.) Further, the counselor may interview the subject inmate as

6   part of the research process. (UF 14.) Inmate Quezada was assigned to D. Schuller's caseload.

7   (UF 15.)

8        There is no dispute that Defendants Burell, Trujillo-Villa, Nwachukwu, Giannandrea, and

9   Smith were present at Plaintiff's classification committee hearing. (UF 25, 30, 34, 38 Smith

10  Decl. ¶ 3.) Defendant Schuller declares that he was not present at the hearing, but he arrived at

11  the facility prior to the assault by inmate Quezada and specifically saw Quezada lunge at

12  Plaintiff. (Schuller Decl. ¶ 4.) Defendants all declare that during the classification review, they

13  were "not made aware of a threat or anything to a threat from Quezada, specifically against

14  Plaintiff Perez, against anyone else, or generally." (Burell Decl. ¶ 6; Trujillo Decl. ¶ 5;

15  Nwachukwu Decl. ¶ 5; Giannandrea Decl. ¶ 4 ; Smith Decl. ¶ 4.) Defendants further declare that

16  if Quezada "had voiced some assertion to harm himself or others, [they] would have followed

17  standard protocol, which was to immediately place handcuffs on Quezada, placed him in a

18  holding cell, and allow custody officers to conduct an investigation." (Burell Decl. ¶ 7; Trujillo

19  Decl. ¶ 6; Nwachukwu Decl. ¶ 6; Giannandrea Decl. ¶ 5 ; Smith Decl. ¶ 6.) Thus, Defendants

20  declare that prior to the incident on December 18, 2018, they had no knowledge of any threat

21  against Plaintiff by Quezada, nor any knowledge of a generalized threat by Quezada. (Burell

22  Decl. ¶ 10; Trujillo Decl. ¶ 9; Nwachukwu Decl. ¶ 9; Giannandrea Decl. ¶ 8 ; Smith Decl. ¶ 9.)

23       However, by way of verified complaint, Plaintiff submits that in February 2019, during

24  an annual classification review, attended by Defendant Schuller, Plaintiff was discussing the

25  heightened anxiety following the incident with inmate Quezada, and Schuller commented that

26  Plaintiff "'shouldn't feel that way' because Quezada had 'intended to attack [him], not

27

28

[Plaintiff]."[4]  (Compl. at 12.)  In May of 2019, Plaintiff was approached by two inmates who informed him that they were near the program office on December 18, 2018, when the attack occurred, and they heard Quezada tell Defendant Trujillo-Villa, "I told you I was going to cut someone if you didn't put me back on Level Three."  (Compl. at 13.)

Inmate Galindo told other inmates that on the day prior to the assault, Quezada told Defendant Nwachukwu "that he didn't want to stay at ASP, and if he had to, he would assault another inmate to get off the yard.  Defendant Nwachukwu responded by telling Quezada he couldn't help him because he wasn't his assigned counselor." (Compl. at 13.)   Inmate Galindo also told other inmate witnesses that "Quezada approached the two Housing Unit 330 officers named as Defendants in ¶(6) above (Defendants Alvarez and Szalai) and repeated his threat to assault another inmate if he was not removed from the yard, but they told him to bring it up at his UCC that morning."  (Compl. at 13-14.)  Inmate Galindo also conveyed to other inmate witnesses that when Quezada walked in to the committee conference room with the six correctional counselors (Defendants Smith, G. Nwachukwu, Burell, Giannandrea, and Trujillo-Villa), he repeated his threat again, and his assigned counselor told him to "do what [he had] to do[.]" (Compl. at 14.)

It is further alleged that following the assault by inmate Quezada, Defendant Nwachukwu asked Plaintiff, "why didn't you even fight back, Perez? I would have at least tried to defend myself." (Compl. at 11.)  Defendant Smith repeatedly mocked Plaintiff about being attacked by telling him "[b]e careful, they're cutting clerks out there," or "Do you need someone to go with you for protection." (Id.)  Defendant Burell asked if Plaintiff wanted to buy life insurance because he was prone to assault.  (Compl. at 12.)

After viewing all the evidence submitted in the light most favorable to Plaintiff, the Court finds there exist genuine issues of material fact with respect to Plaintiff's claim that Defendants A. Smith, D. Schuller, G. Nwachukwu, J. Burell, V. Giannandrea, J. Trujillo-Villa, J. Szalai, J.

---

[4] Although Defendant Schuller declares that he was not present at inmate Quezada's classification hearing on December 18, 2018, Plaintiff claims that he was present.  Furthermore, it is undisputed that Schuller was present on December 18, 2018, prior to the assault on Plaintiff and was Quezada's assigned counselor who specifically interviewed him prior to the assault.  (Schuller Decl. ¶ 3.)

Alvarez acted with deliberate indifference to his safety.  Plaintiff's version of events differs with respect to Defendants prior knowledge and his version must be accepted as true for the purpose of resolving Defendants' motion.  <u>Comite de Jornaleros de Redondo Beach</u>, 657 F.3d at 942; <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1149 (9th Cir. 2010).  The Court may not weigh the parties' evidence or assess their respective credibility, and here there is evidence from which a reasonable jury could find that Defendants A. Smith, D. Schuller, G. Nwachukwu, J. Burell, V. Giannandrea, J. Trujillo-Villa, J. Szalai, J. Alvarez were aware of inmate Quezada's threat to harm another inmate (Plaintiff) on December 18, 2018, if he was not place in handcuffs and placed him in a holding cell, which presented a substantial risk of serious harm to Plaintiff's safety.  <u>See</u> <u>Farmer</u>, 511 U.S. at 842; <u>Lemire v. California Dept. of Corrections and Rehabilitation</u>, 726 F.3d 1062, 1078 (9th Cir. 2013); <u>Foster v. Runnels</u>, 554 F.3d 807, 814 (9th Cir. 2009); <u>Hearns v. Terhune</u>, 413 F.3d at 1041.  As previously stated, the inquiry is factual and to the extent there circumstances which show the risk was not obvious to Defendants or they acted reasonably despite the risk, that determination is left to the trier of fact.  <u>Farmer</u>, 511 U.S. at 842; <u>Foster</u>, 554 F.3d at 814

Accordingly, the Court finds that Defendants A. Smith, D. Schuller, G. Nwachukwu, J. Burell, V. Giannandrea, J. Trujillo-Villa, J. Szalai, J. Alvarez are not entitled to summary judgment and it recommends their motion be denied.

### 2.   Qualified Immunity

The defense of qualified immunity protects "government officials ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). The rule of qualified immunity protects " 'all but the plainly incompetent or those who knowingly violate the law;' " defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably

believed that his particular conduct was lawful." <u>Romero v. Kitsap County</u>, 931 F.2d 624, 627 (9th Cir. 1991).

A right is clearly established if it were "sufficiently clear [at the time of the conduct at issue] that every reasonable official would have understood that what he is doing violates that right." <u>Taylor v. Barkes</u>, 135 S. Ct. 2042, 2044 (2015). "The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority." <u>Tuuamalemalo v. Greene</u>, 946 F.3d 471, 477 (9th Cir. 2019). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. <u>Saucier</u>, 533 U.S. at 202.

A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by <u>Saucier</u>, 533 U.S. at 194); <u>Henry A. v. Willden</u>, 678 F.3d 991, 1000 (9th Cir. 2012) (qualified immunity analysis requiring (1) determining the contours of the clearly established right at the time of the challenged conduct and (2) examining whether a reasonable official would have understood that the challenged conduct violated such right). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. <u>See</u> <u>Pearson</u>, 555 U.S. at 236 (noting that while the *Saucier* sequence is often appropriate and beneficial, it is no longer mandatory). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the non-movant. <u>See</u> <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014).

The qualified immunity inquiry is separate from the constitutional inquiry for a claim of deliberate indifference under the Eighth Amendment. <u>Estate of Ford v. Caden</u>, 301 F.3d 1043, 1053 (9th Cir. 2002) (extending <u>Saucier</u> to Eighth Amendment claims). A determination that

1    there is a triable issue of fact as to whether defendants were deliberately indifferent does not

2    necessarily preclude a finding of qualified immunity. Id.  For a qualified immunity analysis, the

3    court need not determine whether the facts alleged show that defendants acted with deliberate

4    indifference. See Osolinski v. Kane, 92 F.3d 934, 936 (9th Cir. 1996). Rather, the court need

5    only review the relevant law to determine whether, in light of clearly established principles at the

6    time of the incident, the officials could have reasonably believed their conduct was lawful.  Id. at

7    939. It is possible for a prison official to know all of the facts alleged by plaintiff and to

8    understand that he cannot recklessly disregard a substantial risk of harm to a prisoner, and yet to

9    mistakenly, though reasonably, perceive that the risk of harm is not too high; such an official is

10   entitled to qualified immunity. Estate of Ford, 301 F.3d at 1049-50.

11        The plaintiff bears the burden of proving the existence of a "clearly established" right at

12   the time of the allegedly impermissible conduct. Maraziti v. First Interstate Bank, 953 F.2d 520,

13   523 (9th Cir. 1992). The defendant bears the burden of establishing that his actions were

14   reasonable, even if he violated the plaintiff's constitutional rights. White v. Pauly, 137 S. Ct. 548,

15   552 (2017).

16        Viewing the evidence in the light most favorable to Plaintiff, the Court finds Defendants

17   are not entitled to qualified immunity.  First of all, Plaintiff has clearly alleged the deprivation of

18   an actual constitutional right, i.e., an Eighth Amendment right to be protected from violence at

19   the hand of others.  See Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).

20   Secondly, Defendants have failed to establish that their conduct was reasonable. Viewing the

21   evidence in the light most favorable to Plaintiff, Defendants are alleged to have received

22   knowledge from inmate Quezada that he intended to harm another inmate if he was not

23   transferred prior to Quezada's assault on Plaintiff on December 18, 2018, and failed to acted

24   reasonably in response to such threat.

25        At the time of this alleged conduct, it was sufficiently clear that every reasonable official

26   would have understood that he has a duty to protect prisoners from the violence at the hands of

27   other prisoners. See Farmer, 511 U.S. at 833-34, 837. It thus would have been "clear to a

28

reasonable officer that [his] conduct [of increasing the threat of harm to Plaintiff] was unlawful in the situation [Defendants] confronted." Saucier, 533 U.S. at 202; see also Valandingham, 866 F.2d at 1138 (deliberately spreading rumor that prisoner is snitch may state claim for violation of right to be protected from violence while in state custody).  Therefore, it cannot be said that a reasonable officer in Defendants' position would have understood that it was lawful to not segregate Quezada after he threatened to harm other inmates if he was not transferred.  In other words, in light of clearly established principles at the time of the incident, it cannot be said that Defendants could have reasonably believed that his conduct was lawful. See Osolinski, 92 F.3d at 939. Furthermore, Defendants deny having any alleged knowledge of the threats, so it cannot even be argued that they acted with a mistaken belief that their conduct was reasonable. See Estate of Ford, 301 F.3d at 1049-50.  Accordingly, in light of the disputed issues of material fact in this case, Defendants are not entitled to qualified immunity.

### 3. Dismissal of Defendant Doe

Pursuant to the Court's July 22, 2020 screening order, the Court found that Plaintiff stated a cognizable failure to protect claim against the Doe Defendant identified as "ASP Designated Custody Supervisor." (ECF No. 10.)

In the Court's September 30, 2020 service order, it was explained that Defendant Doe could not be served before being identified and noting that Plaintiff could amend his complaint if the Defendant's identity were ascertained during discovery. (ECF No. 15 at n.1.)  Indeed, Plaintiff's complaint acknowledged that the actual identity of the Doe Defendant would be sought during discovery.  (Compl. at 8.)

The March 17, 2021 amended scheduling order provided that the parties could conduct discovery until October 22, 2021.  (ECF No. 37.)  The deadline was subsequently extended to December 22, 2021.  (ECF No. 41.)  Plaintiff has not moved to amend his complaint, moved to substitute a Defendant, or otherwise notified the court of the identity of Defendant Doe.

1

2

Pursuant to Rule 4 of the Federal Rules of Civil Procedure, "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). This 90-day deadline under Rule 4(m) applies to service on unnamed defendants. See Bulgara v. Cty. of Stanislaus, No. 1:18-cv-00804-DAD-SAB, 2020 WL 5366306, at *5 (E.D. Cal. Sept. 8, 2020), report and recommendation adopted, No. 1:18-cv-00804-DAD-SAB (PS), 2021 WL 1105255 (E.D. Cal. Mar. 23, 2021) (dismissing action against "Doe defendants" for failure to serve within Rule 4(m)'s 90-day deadline).  In this case, well over 90 days have elapsed since the filing of plaintiff's signed complaint on June 15, 2020. (ECF No. 1.)  Plaintiff has therefore failed to serve the Defendant Doe in compliance with Rule 4(m).

In addition to Rule 4(m)'s requirements, "a court may dismiss a defendant, a claim[,] or an action based on a party's failure to prosecute an action[,] failure to obey a court order, or failure to comply with local rules." Bulgara, 2020 WL 5366306, at *5 (citing Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (dismissal for failure to comply with an order requiring amendment of complaint), Henderson v. Duncan, 779 F.2d 1421, 1424 (9th Cir. 1986) (dismissal for failure to prosecute and to comply with local rules)). Plaintiff received advisement that he was required to amend his complaint to identify the Defendant Doe so that the complaint could be served. (ECF No. 15.)  Discovery has closed and the deadline to amend the pleadings has passed without Plaintiff filing anything to indicate that he has identified Defendant Doe.

Where plaintiff has failed to effect service in accordance with Rule 4(m) and has failed to comply with the orders instructing him to identify the defendant before the close of discovery, dismissal of a Doe defendant is warranted. See Williby v. California, 276 F. App'x 663, 665 (9th Cir. 2008) (holding district court's sua sponte dismissal of Doe defendants was merited where plaintiff had failed to identify defendants within allotted discovery period); Bulgara, 2020 WL

5366306, at *5 (recommending dismissal of Doe defendants, without additional notice, for failure to effect service under Rule 4(m) where defendants were not identified within the allotted discovery period). Accordingly, it is recommended that Defendant Doe dismissed from this action.

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendants' motion for summary judgment be denied; and

2.      Defendant Doe be dismissed from the action pursuant to Federal Rule of Civil Procedure 4(m).

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 3, 2022**

UNITED STATES MAGISTRATE JUDGE